# IN THE COURT OF APPEALS OF IOWA

No. 22-1211
Filed June 7, 2023

IN THE MATTER OF THE ESTATE OF DELORES TODD, Deceased.

**LISA WITTEN and DEBRA TEMPLEMAN,**
Petitioners-Appellants,

**vs.**

**BARBARA RADKE, Individually and as Executor of the ESTATE OF DELORES TODD, WILLIAM TODD, CRYSTAL ANDERSON, LUCAS TODD, CODY TODD, CHARLES TODD, MICHAEL TODD, and MARK TODD,**
Respondents-Appellees.
_____

Appeal from the Iowa District Court for Ida County, Steven J. Andreasen, Judge.

Beneficiaries of a will appeal from a declaratory judgment ruling to construe the will. **AFFIRMED.**

Maura Sailer of Lohman, Reitz, Sailer, Ullrich & Blazek, Denison, for appellants.

George W. Wittgraf of Wittgraf Law Firm, Cherokee, for appellees Barbara Radke and Michael Todd.

John M. Loughlin of Loughlin Law Firm, Cherokee, for appellee Charles Todd.

Heard by Tabor, P.J., Greer, Ahlers, Chicchelly, and Buller, JJ.

**BULLER, Judge.**

We are presented in this appeal with the choice of rewriting a will to better effect a testator's rather clear intent to devise equally among her children, or instead harshly enforcing outdated dollar amounts that could lead to a materially unequal distribution among the children. Because our case law dictates that we are forbidden from rewriting a will or modifying unambiguous language, we affirm the probate court's decision to enforce the will as written.

### I.     Background Facts and Proceedings

Delores Todd and her late husband Ralph Todd lived on a farm in Ida County and raised seven children: John, Debra, Barbara, Charles, Michael, Lisa, and Mark. Delores was described as a quintessential "farm wife." She was primary caregiver for the children while also performing significant work around the farm, baking, gardening, and maintaining the home. In the words of her long-time farm and tax lawyer, she was "unsophisticated, nice, fair, honest."

Ralph died in 1995, and Delores then held sole title to the farm properties, including about $380,000 in associated debt. A few months after Ralph's death, Delores executed a last will and testament making a general devise of the entire estate to her children in equal shares.

Mark, John, and Charles began working Delores's farmland in various capacities and did so until Delores's death. Delores was the ultimate decision-maker for the farm, even though Mark handled much of the management and the other sons did much of the day-to-day work. Although the sons were not initially paid due to cash-flow issues with the farm's debt, they were all compensated in-kind (with housing, equipment or pasture use, or hay) and later with cash during

Delores's lifetime. Mark testified there was no agreement that they would receive compensation for past work after Delores's death.

When the farm did particularly well, Delores would split proceeds among the seven children equally. When Delores gave gifts at Christmas, anniversaries, weddings, and birthdays, "[t]hey were always equal." When Delores had to move to the nursing home, the children drew cards to equitably divide furniture in the home so that one of the children could move in. When raising the children, Delores would set a timer to ensure equal time with toys, and she divided out Starbursts and M&Ms equally to ensure everyone received identical amounts.

In the mid-2000s, Delores discussed with Mark her desire to "split up the land" and revise her will. There were seven children, but only five parcels of land. So Delores came up with a plan for some of the children to get land and some to get cash to avoid splitting the parcels. Delores asked Mark to help her value the land, and he did so. They discussed how it was impossible to know the land value at the time of Delores's death, so Mark told her, "Put [the land value] in low, and if it's not right, we will have to make it right—I'm sure we will have to make it right." Mark testified at the declaratory-judgment hearing that he believed his mother included the fixed values for the equalization payments intending that the siblings "would make it right if it wasn't" consistent with current values. In other words, Mark believed Delores's intent was that the payment amounts would be adjusted one way or another at the time of her death.

Delores executed a new will in 2010. Delores brought handwritten notes with her that explained her intent to devise specific parcels of real estate to John, Michael, Mark, Charles, and Barbara, and to require those children to make

specific cash payments to Lisa and Debra (who did not receive any land).  These terms were reduced to writing in the will by Delores's attorney:

> A. I give to my son, John Todd the real estate located in the South One-half of the Northwest Quarter of Section 5, Township 89 North, Range 41, Ida County, Iowa on the provision that he pays to my daughter, Lisa Witten the sum of $18,967.00 within 6 months after my death.  This payment shall be a lien on the real estate until it is paid.
> B. I give to my son, Michael Todd the real estate located in the North One- half of the Southwest Quarter of Section 5, Township 89 North, Range 41, Ida County, Iowa on the provision that he pays to my daughter, Lisa Witten the sum of $18,967.00 within 6 months after my death.  This payment shall be a lien on the real estate until it is paid.
> C. I give to my son, Mark Todd the real estate located in the East One-half of the Southwest quarter of Section 4, Township 89 North, Range 41, Ida County, Iowa on the provision that he pays to my daughter, Lisa Witten the sum of $1,551 within 6 months after my death.  This payment shall be a lien on the real estate until it is paid. I give to my son, Charles Todd the real estate located in the North One-half of the West 60 acres of the Southwest Quarter and the West One-half of the Northwest Quarter except the parcel in the southwest corner thereof all in Section 4, Township 89 North, Range 41, Ida County, Iowa on the provision that he pays to my daughter, Lisa Witten the sum of $12,816 within 6 months after my death.  This payment shall be a lien on the real until it is paid.
> D. I give to my daughter, Barbara Radke the real estate located in the West One-half of the Northwest Quarter of Section 29, Township 89 North, Range 40, Ida County, Iowa with exceptions on the provision that she pays to my daughter, Lisa Witten the sum of $3,132 and to my daughter, Debra Templeman the sum of $55,434 within 6 months after my death.  This payment shall be a lien on the real estate until it is paid.
> E. I further provide that in the event any of my children desire to sell their farmland they shall first offer it to their siblings upon the same terms and conditions as that received from a third party.  This right of first refusal is limited to my children living at the time of the proposed sale.

The handwritten notes include the math Delores used in arriving at the cash-equalization payments to ensure her children received equal shares, based on the 1995 values.  The executed will further provided that the residue of Delores's

estate would be divided among all the children "share and share alike," with the share of any predeceased children passing to his or her heirs.

Delores remained in generally good health and managed her own affairs until she moved to a nursing home in 2015. John passed away in 2019, but the rest of Delores's children—and John's children in his place—survived her death in 2020 and were present at the reading of her will. Barbara was nominated and appointed executor.

There is no evidence Delores ever had a falling out or any significant problems with any of her children. Mark, Delores's youngest son, vouched that Delores "had a good relationship" with all of the children and they were a close family. Lisa, the youngest daughter, gave similar testimony. As did Delores's nephew. Delores's farm and tax attorney, who met with Delores about twice a year, agreed that there were no significant problems between Delores and any of the children.

Lisa and Debra filed a petition for declaratory judgment seeking to construe the will to follow what they believe to be Delores's intent: to equally divide the entire estate among her children. Mark also testified that he wished for the court to look beyond the specific numbers in the will and make equitable distributions among the children, even though it was to his personal disadvantage. Delores's niece testified that Delores made remarks about how she would strive to "keep everything even between [her] children."

Lisa and Debra also sought construction of the will concerning the parcels of real estate. After Delores's death, the family discovered that approximately thirty acres of Delores's real estate were not included in the will. Although there may

have been a claim that this property should therefore fall into the residuary estate, Lisa and Debra did not make that argument—even though it would have been to their benefit. All of the children agreed that Delores intended to devise ten of the acres to Charles and twenty of the acres to Mark, and the attorney who prepared Delores's will testified that he committed a scrivener's error in preparing the will based on Delores's handwritten notes. All of the children also agreed that Delores did not intend to divide these parcels, and that it would be unworkable to do so given the lack of independent access to the portions omitted from the will.

After a contested hearing, the probate court found the cash-equalization-payments portion of the will was unambiguous and enforced the fixed dollar amounts. In contrast, the court found ambiguity in the incomplete real estate descriptions and directed these unaccounted-for acres be considered a bequest by implication to Mark and Charles, without any modification to the cash payments they would make to Lisa and Debra.

Lisa and Debra appeal from the declaratory-judgment ruling, challenging only the cash-equalization-payments portion of the will. A will contest action alleging undue influence and lack of testamentary capacity remained pending when this appeal was taken.

## II.    Standard of Review

"A declaratory judgment action to interpret a will is tried in equity, and our review is de novo. While we give weight to the trial court's findings of fact, we are not bound by them." *In re Est. of Rogers*, 473 N.W.2d 36, 39 (Iowa 1991) (internal citation omitted).

### III.    Discussion

Lisa and Debra ask us—under the guise of construing the will—to modify the overall property allocation to evenly distribute the sum assets of the estate equally among Delores's seven children.  For the reasons below, we cannot grant their request and must affirm.

In reviewing this will, we are guided by well settled principles:

    (1)  the intent of the testator is the polestar and must prevail;
    (2)  this intent, however, must be derived from
        (a)  all of the language contained within the four corners of the will,
        (b)  the scheme of distribution,
        (c)  the surrounding circumstances at the time of the will's execution and
        (d)  the existing facts;
    (3)  we resort to technical rules or canons of construction only when the will is ambiguous or conflicting or the testator's intent is uncertain.

*Id.*  "In searching the will for the testator's intent, the instrument must be considered as a whole and each part given meaning and effect, if possible."  *Id.*  We may consider extrinsic evidence only to resolve ambiguities, and not to contradict or add terms to the will or to show an intention different from that disclosed by the language of the will.  *Id.*

Our courts recognize both patent and latent ambiguities.  *In re Est. of Lepley*, 17 N.W.2d 526, 529 (Iowa 1945).  "A patent ambiguity is that which appears on the face of the will and arises from the phraseology or the defective, obscure, doubtful or uncertain language.  It arises upon the reading of the will."  *Id.*  "A latent ambiguity exists where the language of the instrument does not lack certainty but some extrinsic or collateral matter outside the will renders the

meaning obscure and uncertain. A classic example is a bequest in a will 'to my cousin John' when the testator has two cousins named John." *Id.*

Lisa and Debra's argument proceeds from their concession that, "On its face, Article IV [the real-estate/cash-equalization portion of the will] is not ambiguous." This leaves only a latent-ambiguity question for our court to resolve.

We agree with Lisa and Debra that it is virtually undisputed Delores's overall intent was for her estate to be equally divided among her seven children. The math in her handwritten notes supports that conclusion, as do her statements to Mark and others. But to consider this fairly compelling extrinsic evidence of Delores's subjective intent, we would first have to find that the cash-equalization-payment terms of the will are ambiguous. And this we cannot do.

The will devises specific parcels of real estate and sets forth—down to the penny—the cash-equalization payments that are to be made to Lisa and Debra by the siblings who received property. What Lisa and Debra request is really for us to reform and rewrite the will, swapping out the cash values Delores determined with values of our own creation. But "[i]t is the settled rule that a court of equity, even, cannot reform a will." *Eckford v. Eckford*, 53 N.W. 345, 349 (Iowa 1892). And really, to do what Lisa and Debra ask would require us to not just reform the will, but contradict its specified dollar amounts, which is expressly forbidden. *See id.* For better or worse, our case law requires us to presume Delores knew the effect of the language used in her will, particularly when it was prepared by an experienced scrivener—as it was here. *Rogers*, 473 N.W.2d at 40. We lack authority, even in equity, to grant the relief Lisa and Debra request.

We also must engage with an argument Lisa and Debra advance in their briefing, which is that the probate court inconsistently applied the law by construing the will to correct the defective real estate descriptions, while refusing to correct Delores's specified cash-equalization payments. This "good for the goose, good for the gander" argument has some appeal, but a closer analysis supports the district court's ruling on a few bases. First, Delores's attorney admitted to a scrivener's error in the properties' legal description. Second, the unaccounted-for parcels could not realistically be separated from those listed in the will. And third, our case law has long permitted equity courts the latitude to address incomplete or inaccurate property descriptions to carry out a testator's intent. *See Eckford*, 53 N.W. at 348–49. Resolving the incorrect property descriptions, but passing on rewriting the fixed dollar amounts, is supported by—not inconsistent with—Iowa law.

We also must part ways with a portion of the probate court's analysis, where it speculates at some length as to potential motives Delores may have had in distributing the property based on the 1995 farm values. Considering extrinsic evidence to delve into the underlying intent is only proper in resolving ambiguities. *Rogers*, 473 N.W.2d at 39. We therefore disavow the portion of the probate court's ruling that speculates as to Delores's motivations while approving of the result.

In the end, while we think Delores's use of the 1995 land values in making her calculations may not have resulted in the equal distribution she hoped for, it is not our role to question the wisdom of her arithmetic or the choices she made. *See Eckles v. Lounsberry*, 111 N.W.2d 638, 646 (Iowa 1961) ("We have no occasion to inquire into the wisdom of this gift. The estate was testator's and he could do

with it as he pleased so long as he did not violate any rule of law or public policy."). We are bound by the words Delores actually used, and we lack the power to reform or rewrite the will. To conclude otherwise would enable courts to contravene testators' intent solely based on after-death testimony concerning the decedent's intent.

**AFFIRMED.**